UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAMEE L. WADE,<br><br>                    Plaintiff,<br><br>v.<br><br>CITY OF FRUITLAND; CITY OF FRUITLAND POLICE DEPARTMENT; AND OFFICER BILL COPELAND, CITY OF FRUITLAND POLICE DEPARTMENT,<br><br>                    Defendants. | Case No. 1:12-cv-00465-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiff Jamee Wade filed this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants City of Fruitland, its Police Department, and Officer Bill Copeland, claiming that Officer Copeland's use of deadly force incident to a call regarding a domestic disturbance constituted excessive force under the Fourth Amendment. Wade brings two additional claims under the Idaho Tort Claims Act for reckless, willful and wanton conduct, and gross negligence.

Defendants filed a motion for summary judgment, arguing that the facts are undisputed as a matter of law and they are entitled to judgment on all four counts asserted in the Complaint. The Court conducted a hearing on February 26, 2014. After carefully

**MEMORANDUM DECISION AND ORDER - 1**

considering the parties' arguments, the relevant authorities, and the record before the Court, the Court finds there are disputed issues of material fact that preclude summary judgment. The Court's analysis follows.

## FACTS[1]

On December 22, 2011, Wade attended a movie with his mother, Eva Wade, and became agitated during the movie. During the ride home, Wade and his mother argued, and Wade threatened to kill his mother.[2] Fearing for her safety, Mrs. Wade drove to her mother's house located at NW 2nd Avenue in Payette County rather than returning to her home alone with her son. Initially, Wade prevented his mother from exiting the car, but she eventually was able to leave. On her way inside her mother's residence, Mrs. Wade called 911, informing the dispatcher that a relative was threatening to kill her. Once Mrs. Wade was inside her mother's residence, she locked the doors and waited for police to arrive. Wade remained in the passenger seat of the vehicle, which was parked in the driveway.

Officer Copeland and Officer Carter were dispatched separately to the residence, with Officer Copeland assigned an assisting role. Officer Copeland recalls being informed by police dispatch that Wade was making threats, but that he had remained in the car. Enroute, Officer Carter briefed Officer Copeland about an incident that occurred

---

[1] The Court finds the following facts material and undisputed or, when disputed, taken in the light most favorable to Wade, the Plaintiff and non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the non-moving party on motion for summary judgment).

[2] Wade was being treated for mental illness, and was suspected by his mother of having consumed alcohol before arriving at the movie theater.

**MEMORANDUM DECISION AND ORDER - 2**

the night before, where Wade had called police dispatch and demanded they send out a

SWAT team, and that Wade "was looking for a fight." Copeland Depo. at 90 (Dkt. 36-

10.) Officer Carter had actually spoken to Wade the night before, and "talked Jamee

down." Carter Depo. at 45 (Dkt. 36-11.) Carter felt Copeland needed to know of the

incident the night prior so Officer Copeland could know what type of situation he might

be getting himself into, as there was a possible officer safety issue. Carter Depo. at 46

(Dkt. 35-4.) As a result of Officer Carter's briefing, Officer Copeland had a "heightened

sense of awareness." Copeland Depo. at 90. Officer Copeland had responded also to an

attempted suicide call on September 12, 2011, the subject of which was Wade, who had

slit his wrists using a small boot knife.

Officer Copeland arrived at the residence first, and turned on his spotlight and

take-down lights to illuminate the area in front of the car. Officer Copeland then exited

his vehicle. Officer Carter had not yet arrived.

The next set of events occurring in the driveway the night of December 22, 2011,

differ depending upon witness recollection, and there is no audio or video recording of

Wade's initial encounter with Officer Copeland after Copeland arrived on the scene.

According to Officer Copeland, as he approached the parked vehicle, the passenger door

opened, Wade exited and started walking toward the patrol car. Copeland described

Wade as wearing a hoody sweatshirt and winter clothes. Copeland reportedly

commanded Wade to stop and show his hands, but instead, Wade threw the sweatshirt

hoody over his face, put his hands in his pockets, and continued walking toward

Copeland's patrol car. Copeland allegedly gave Wade more commands to stop and show

**MEMORANDUM DECISION AND ORDER - 3**

his hands, or he would shoot, but Copeland reported that Wade yelled, "Fuck it, do it, fucking, let's do it, or fucking do it, then, something to that effect." Copeland Depo. at 108-109 (Dkt. 36-10.) The entire time, Copeland avers that Wade's hands were in his pockets, his face was covered, and Wade did not obey his commands. Although Copeland did not see a weapon, because Wade failed to comply and "continued to aggress," Copeland fired two shots and Wade went down. Copeland knew the shots hit Wade, because he described Wade as "grabbing his upper chest and arm area." Copeland Depo. at 111 (Dkt. 36-10.)

Mrs. Wade, who had moved inside the house to her mother's bedroom, had a view of the driveway from the bedroom window. She describes the events differently. She stated she saw Wade "get out of the car with his hands up in the air and walk toward the police car that was at the end of the driveway." Eva Wade Depo. at 27 (Dkt. 35-4.) Mrs. Wade described Wade's hands as in the air "as soon as he got out of the car." Eva Wade Depo. at 65 (Dkt. 36-9.) Mrs. Wade remembers that Wade's hands were in the air "from the time he got out of his vehicle until the time he was out of [her] sight." Mrs. Wade also described her son as "not aggressive," which she could see when she observed him walking. Eva Wade Depo. at 76 (Dkt. 36-9.) After Wade walked out of Mrs. Wade's line of sight at the window, she heard two shots.  The next time Mrs. Wade saw her son was out by the road, after hearing three more gunshots. Eva Wade Depo. at 70 (Dkt. 36-9.)

Wade recalls he was told by Officer Copeland to exit the vehicle, and put his hands in the air, "which [he] did," and to take steps toward Officer Copeland, which he did. Wade Depo. at 69, 92 (Dkt. 36-8.) Wade heard Officer Copeland say, "stop," and

**MEMORANDUM DECISION AND ORDER - 4**

that because he was "halfway through a step," Wade finished his step, and that is when he was shot in the abdomen and in the right upper arm. Wade Depo. at 70 (Dkt. 36-8.) After falling to the ground, Wade does not recall the next series of events. *Id.* at 95-97 (Dkt. 36-8.)

Copeland contends that he continued to give Wade commands while Wade was on the ground to "show his hands," and to stay on the ground, but that Wade stood up, and began advancing upon Officer Copeland. Copeland Depo. at 115 (Dkt. 36-10.) Officer Copeland described Wade as continuing to "aggress" him, and failing to obey his commands to stop, causing Copeland to back up out into the road. Copeland Depo. at 111-113 (Dkt. 36-10.) Copeland did not see a weapon when Wade approached. *Id.* But Copeland described Wade as aggressively advancing upon him, swinging his arms and stalking toward him, and failing to comply with Officer Copeland's verbal commands to stop and get on the ground. Officer Copeland fired three more rounds, and Wade fell to the ground.

Officer Carter arrived just prior to the second round of shots to see Officer Copeland fire on Wade, and witnessed Wade fall to the ground. Carter Depo. at 34 (Dkt. 36-11.) Officer Carter had activated his camera and video recording device upon arriving at the scene. Officer Carter described Wade's gestures and demeanor as indicating rage.

**MEMORANDUM DECISION AND ORDER - 5**

Carter Depo. at 47. Defendants provided the video recording of the second round of shots fired. Naylor Decl. Ex. C.[3] Copeland and Carter then secured Wade and the scene.

Defense expert Greg Meyer, a former member of the Los Angeles Police Department, has offered the opinion that Officer Copeland's tactical actions as the first responder to arrive on scene were reasonable based upon his prior knowledge of Wade, and the sudden aggressive action by Wade. As a result, Mr. Meyer is of the opinion that Copeland's initial use of deadly force was objectively reasonable given the totality of the circumstances, and that the second use of deadly force against a determined, hostile and aggressively advancing subject was objectively reasonable. In Mr. Meyer's opinion, Wade's hands could not have been raised over his head when the first two shots were fired based upon the trajectory of the bullet that hit Wade in the upper arm.

According to Plaintiff's expert Jeffrey Noble, who was the Deputy Chief of Police with the Irvine, California, Police Department for 28 years, neither use of force was reasonable. Mr. Noble is of the opinion that Officer Copeland's fear for his safety was irrationally based solely upon Wade's attire and the fact Wade's hands were in his pockets. Further, Mr. Noble's opinion is that the second use of deadly force, after Wade was shot twice, was unreasonable because Wade was already wounded, was not brandishing a weapon, and was out of arm's reach of Officer Copeland, and another police officer was on the scene.

---

[3] At the hearing, the Court informed the parties that it was unable to view the video recording provided on disc. Since the hearing, the Court was able to view the video recording with the assistance of the Court's information technology department. There was no audio on the recording.

**MEMORANDUM DECISION AND ORDER - 6**

Officer Copeland's use of force was investigated by the Idaho State Police, which concluded their investigation on January 31, 2012. Based upon the ISP investigation and an Administrative Panel Review, Officer Copeland's use of force was determined not to violate any use of force policy of the City of Fruitland Police Department.

Based on the above facts, Wade's four count Complaint alleges one constitutional violation under 42 U.S.C. § 1983 of excessive force in violation of the Fourth Amendment (Counts I and II); reckless, willful, and wanton conduct (Count III) pursuant to Idaho Code § 6-901; and gross negligence pursuant to Idaho Code § 6-901 (Count IV). Defendants seek summary judgment on all four of Wade's claims.

## DISPOSITION

### 1.    Summary Judgment Standards

A principal purpose of summary judgment is to "isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 256–57. The non-moving party must go beyond the pleadings and show "by [its] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

The party bearing the burden of proof at trial "must establish beyond controversy every essential element of its ... claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (adopting decision of district court "as our own"). A party who does not have the burden "may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact." Fed. R. Civ. P. 56(c)(1)(B) (advisory committee's note.) As a general rule, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co.*, 336 F.3d at 889.[4]

---

[4] An exception to this rule exists when cross-motions for summary judgment are filed. In that case, the Court must independently review the record for issues of fact. *Fair Housing Council of Riverside Co., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Here, Wade did not file a cross motion.

**MEMORANDUM DECISION AND ORDER - 8**

2.      **Section 1983: Civil Rights Violation Claims in General**

The purpose of 42 U.S.C. § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to harmed parties. *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992). To state a claim under § 1983, a plaintiff must allege facts which show a deprivation of a right, privilege or immunity secured by the Constitution or federal law by a person acting under color of state law. *Id*. Acting under color of state law is "a jurisdictional requisite for a § 1983 action." *West v. Atkins*, 487 U.S. 42, 46, (1988). In this case, it is not disputed that Officer Copeland was acting under color of state law. Therefore, the question becomes whether the Defendants' actions deprived Wade of a right, privilege or immunity secured by the Constitution or federal law.

Although not articulated in the Complaint, Wade appears to bring both official capacity and individual capacity claims against Defendants, but does not clearly identify in what capacity each Defendant is sued. Neither party elaborated upon this crucial distinction in their briefs. When an official, such as Officer Copeland, is sued under § 1983 for damages, it is presumed that the suit is against the state actor in his individual capacity. *Shoshone–Bannock Tribes v. Fish and Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994). This is because a claim for damages against state officials is barred by the Eleventh Amendment. *Id*.

Here, Wade adequately pleads Officer Copeland is an individual, and he seeks money damages against Officer Copeland for alleged violations of Wade's constitutional rights. Count I, which includes all Defendants, and Count II, which includes only Officer

Copeland, assert excessive force claims under the Fourth Amendment. But it is unclear whether Count I, styled as "general allegations" for "violation of civil rights pursuant to Title 42 U.S.C. § 1983," actually asserts a claim separate from Count II. Absent elaboration by either party, the Fourth Amendment claim for excessive force asserted generally in Count I and specifically in Count II against Officer Copeland will be construed as a claim against Officer Copeland in his individual capacity.[5]

The Court will first address the claims asserted against Officer Copeland. Wade brings a claim of unreasonable seizure by use of deadly force under the Fourth Amendment. There is no dispute that Wade was ultimately "seized" at the conclusion of the second round of gunfire. Defendants move for summary judgment for Officer Copeland on the grounds that the two incidents of force used were objectively reasonable, and therefore constitutional, and that Copeland is entitled to qualified immunity.

When a government official asserts the defense of qualified immunity in an excessive force case brought under 42 U.S.C. § 1983, the threshold inquiry is whether the plaintiff's allegations, if true, establish a constitutional violation. *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Then, in the context of a Fourth Amendment excessive force case, the Court must determine whether the actions alleged violate a clearly established constitutional

---

[5] As further support for the Court's conclusion, Wade seeks monetary damages, including punitive damages, against "Defendants" in Count I. However, punitive damages are not recoverable against a municipal defendant in a § 1983 action, and are recoverable only against the officer in his individual capacity. *Muth v. Anderson*, No. 1:11–cv–00461–EJL, 2012 WL 2525574 *5 (June 29, 2012) (citing *City of Newport v. Facts Concerts, Inc.*, 453, U.S. 247 (1981)).

right, "where 'clearly established' means that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

*Graham v. Connor*, 490 U.S. 386, 397 (1989), establishes the starting point for analyzing whether the force used is excessive as measured by objective standards of reasonableness. *Wilkins*, 350 F.3d at 954. *Graham* is applied at the first stage of the qualified immunity analysis, and the inquiry is whether it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation he confronted. *Wilkins*, 350 F.3d at 954 (citing *Saucier*, 533 U.S. at 205). "That is, the first step in the analysis is an inquiry into the objective reasonableness of the officer's belief in the necessity of his actions, and there is no Fourth Amendment violation if the officer can satisfy this standard." *Wilkins*, 350 F.3d at 954 (citing *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)).

The second part[6] of the analysis "is to inquire whether the officer was reasonable in his belief that his conduct did not violate the Constitution." *Wilkins*, 350 F.3d at 955. Here, the Court inquires into the reasonableness of the officer's belief in the legality of his actions. *Id.* (citing *Saucier*, 533 U.S. at 206).  If the officer's actions violated the Fourth Amendment, a reasonable but mistaken belief that the conduct was lawful would result in the grant of qualified immunity. *Id.* Qualified immunity thus "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

---

[6] In *Pearson v. Callahan*, 555 U.S. 223 (2009), the United States Supreme Court held that the two step sequence adopted by *Saucier* does not need to be addressed in any particular order.

**MEMORANDUM DECISION AND ORDER - 11**

### A. *Whether Copeland's Actions Were Objectively Reasonable*

The Fourth Amendment "has long recognized that the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat to effect it." *Graham*, 490 U.S. at 396. Although it is not required that police officers use the "least intrusive degree of force possible ...", *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994), the "force which [i]s applied must be balanced against the need for that force." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (quoting *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997)). However, because excessive force cases usually turn on a jury's credibility determination, summary judgment should be granted sparingly. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

Excessive force cases are decided on a case-by-case basis to determine whether the totality of the circumstances justified the force used as judged from the perspective of a reasonable officer at the scene. *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving about the amount of force that is necessary in a particular situation." *Id*. at 396–97. Thus, the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 397.

Determining whether the force used to effect an arrest was reasonable under the Fourth Amendment, however, requires a balancing of the nature and quality of intrusion on the individual's interests against the governmental interests at stake. *Id*. at 396. The

following factors must be considered in this analysis: (1) the severity of the crime at issue; (2) whether Wade posed an immediate threat to the safety of the officers or others; and (3) whether Wade actively resisted arrest. *Ramirez v. City of Ponderay*, 2008 WL 2445483, at *7 (D. Idaho June 16, 2008) (citing *Arpin*, 261 F.3d at 921).

When evaluating an excessive force claim, summary judgment is appropriate for the defendant if the court "concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under all circumstances." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). The Court concludes there are disputed issues of material fact precluding the Court from holding, as a matter of law, that Officer Copeland's use of force was objectively reasonable under the totality of the circumstances.

Although dispatched to a domestic disturbance and not to a crime scene, the threat posed to Officer Copeland and others is the most significant *Graham* factor in this case. *Brooks v. City of Seattle*, 599 F.3d 1018, 2010 WL 1135776, at *8 (9th Cir.2010) (citing *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir.1994)). The Ninth Circuit views officers' safety as "the most important of the three factors." *Miller v. Clark*, 340 F.3d 959, 964 (9th Cir. 2003) (quoting *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994)). However, "[a] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281.

Under this factor, Wade argues he complied with all commands and posed no threat, while Defendants argue that Wade acted aggressively, had his hands in his pockets

**MEMORANDUM DECISION AND ORDER - 13**

at all times, and could have been carrying a concealed weapon. Prior to arriving at the scene, Officer Copeland knew that Wade had actively provoked a police confrontation the previous night, and he had been suicidal in the recent past. But, there is conflicting evidence based upon eyewitness reports and Wade's own testimony whether Wade posed an immediate threat, and whether Wade actively resisted arrest.

The facts are disputed whether Wade was not compliant with Officer Copeland's commands, or whether he had his hands up and was trying to comply with Copeland's verbal commands when he was shot the first time. There is no on-board video to confirm or deny either version of events. Two experts[7] interpret the events differently based upon the same facts before the Court. The conflicting expert reports are relevant evidence of reasonableness, and a rational jury may rely upon expert evidence in assessing whether an officer's use of force was unreasonable. *Sheehan v. City & Cnty. Of San Francisco*, No. 11-16401, Slip. Op. at 24, ___ F.3d ___ (9th Cir. Feb. 21, 2014). Viewing the facts in a light most favorable to Wade, a reasonable jury could find objectively that Wade was not a serious threat to Officer Copeland at the time of the first confrontation, when the initial two shots were fired.

As for the second round of shots, the Court is confronted again with a disagreement between two experts regarding the events. On the one hand, Copeland knew Wade had been shot twice from the first volley of shots. But, both Copeland and Carter viewed Wade as aggressive. Nevertheless, two experts, whom neither party disputes is

---

[7] Neither party filed an objection to the Court's consideration of the opposing party's expert opinion at this stage in the proceedings.

**MEMORANDUM DECISION AND ORDER - 14**

qualified, have rendered contrary opinions after watching the same on-board video from Officer Carter's vehicle, and reviewing the officers' statements. It is not for the Court to weigh the evidence upon summary judgment, or determine the credibility[8] of the experts.

Based upon the record before it, the Court cannot conclude on summary judgment as a matter of law that the two instances of deadly force were reasonable and not excessive under the Fourth Amendment.

### B. *Whether Copeland's Actions Were Legally Permissible*

Copeland next asserts that, even if his actions were not objectively reasonable, he is entitled to qualified immunity because, under the second prong of the qualified immunity analysis, "another officer under the same circumstances could have reasonably acted in the same way as Officer Copeland. . . . There is no sufficient case law that would have given Officer Copeland fair warning that he could not use deadly force in defending himself against an unprovoked and aggressively violent subject, who potentially has a hidden weapon, who had credibly threatened to kill his own mother and the officer himself, and was non-compliant to repeated police commands." Defs.' Mem. at 16 (Dkt. 35-1.) In other words, Officer Copeland argues that even if his use of force violated the Fourth Amendment, he is nevertheless entitled to qualified immunity because the law was not clearly established that he could not use deadly force under the factual circumstances presented.

---

[8] At the hearing, Defendants argued Wade's expert relied upon incomplete information. Again, however, it is not for the Court to weigh the experts' opinions upon summary judgment.

**MEMORANDUM DECISION AND ORDER - 15**

Copeland's argument contains a fundamental flaw in the application of the second prong of the qualified immunity analysis. The second prong of the analysis concerns the reasonableness of the officer's mistake of <u>law</u>, contrary to the first prong, which involves a mistake of <u>fact</u>. *Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011). For example, an officer might correctly perceive "all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205. But an official can still have fair warning that his conduct violates established law "even in novel factual circumstances." *Torres*, 648 F.3d at 1129. Copeland does not identify any <u>legal</u> mistake regarding the contours of Wade's Fourth Amendment right. And, under the law applied in the Ninth Circuit, "an unreasonable mistake in the use of deadly force against an unarmed, nondangerous suspect violates the Fourth Amendment." *Torres*, 648 F.3d at 1129.

Rather, Copeland's argument asserts factual mistakes which, as explained above, are disputed. Mrs. Wade describes her son as "not aggressive," with his hands in the air from the moment he exited the car. Wade also describes himself as compliant with Officer Copeland's demands. In contrast, Officer Copeland describes Wade as aggressive with his hands in his pockets. Whether Officer Copeland's mistake of fact was reasonable depends upon which version of the facts a jury accepts, and which expert the jury finds more credible on this issue. If the facts are construed in the light most favorable to Wade, and he was indeed compliant with Officer Copeland's initial demands to stop and put his

**MEMORANDUM DECISION AND ORDER - 16**

hands up, Officer Copeland could not have reasonably believed that the initial use of deadly force was lawful. *Torres*, 648 F.3d at 1129.[9]

Because the lawfulness of the seizure by use of force turns on the reasonableness of Officer Copeland's factual mistake, the Court finds that the second prong of the immunity analysis is inapplicable. *See Wilkins v. City of Oakland*, 350 F.3d 945, 955-56 (9th Cir. 2003) (where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor and against the non-moving party, summary judgment is not appropriate).

### C.   *Liability of the City of Fruitland and the Fruitland Police Department*

Wade's claims against Defendants City of Fruitland and the Fruitland Police Department are not as clear. A municipality may not be held liable under Section 1983 solely because it employed a constitutional wrongdoer. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). Municipalities can only be held liable "if either a policy or custom leads to the violation of the constitutional right." *Mason v. City of Camas*, 2006 WL 2871832 (W.D. Wash. Oct.6, 2006) (citing *Monell*, 436 U.S. at 690–91). To establish liability, a plaintiff must "allege that the action inflicting injury flowed from either an explicitly adopted or tacitly authorized city policy." *Gibson v. United States*, 781 F.2d

---

[9] Wade is not immune from misunderstanding the doctrine of qualified immunity. He argues that named Defendants City of Fruitland and its police department are not shielded from liability on the basis of qualified immunity. But the doctrine of qualified immunity protects city officials "from personal liability in their *individual* capacities for their official conduct;" it therefore does not apply to municipal defendants. *Community House, Inc. v. City of Boise*, 623 F.3d 945, 964 (9th Cir. 2010). Further, a city official may be entitled to qualified immunity with respect to constitutional violations asserted against him in his individual capacity, but remain subject to suit in his official capacity as a municipal policy maker. *Id.* at 973.

**MEMORANDUM DECISION AND ORDER - 17**

1334, 1337 (9th Cir. 1986). This requires the plaintiff establish evidence of a "formal policy" or "widespread practice" by the county. *Nadell v. Las Vegas Metro. Police Dept.*, 268 F.3d 924, 929 (9th Cir.2001).

A custom may be inferred from "evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Gillete v. Delmore*, 979 F.2d 1342, 1349 (9th Cir.1992). However, "[a] plaintiff cannot prove the existence of a municipal policy or custom based solely on the occurrence of a single incident or unconstitutional action by a nonpolicymaking employee." *Davis v. City of Ellsenburg*, 869 F.2d 1230, 1233 (9th Cir. 1989). Additionally, it must be shown that it was the municipality's deliberate conduct that was the moving force behind the injury alleged. *Bd. of the County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 397 (1997) (emphasis in original). In other words, a plaintiff must identify the local government act---the policy---that is the cause of the constitutional violation.[10] In the absence of a constitutional violation, a municipality cannot be held liable under Section 1983. *Sweaney v. Ada County*, 119 F.3d 1385, 1392 (9th Cir. 1997).

Further, "section 1983 claims against government officials in their official capacities are really suits against the government employer because the employer must

---

[10] For example, a municipality's failure to train or supervise its employees can be an unconstitutional "policy" for purposes of § 1983 liability. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). To be actionable under § 1983, the failure to train or supervise must amount to "'deliberate indifference to the rights of persons' with whom those employees are likely to come into contact." *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir.2001) (quoting *City of Canton*, 489 U.S. at 388–89). The most often cited example—hypothesized by the Supreme Court in *Canton*—is a city that arms its police officers but fails to train them on the proper use of deadly force despite knowing "to a moral certainty" that officers will be required to capture fleeing felons. *City of Canton*, 489 U.S. at 390 n. 10.

pay any damages awarded." *Butler v. Elle*, 281 F.3d 1014, 1023 n. 8 (9th Cir.2002). In such suits, the real party in interest is the entity for which the official works. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Therefore, a suit against Officer Copeland in his official capacity is the same as a suit against the City of Fruitland—the payor of any damages that may be awarded.

Wade's Complaint, and the parties' briefs, do not articulate whether Officer Copeland was sued also in his official capacity. Count II of the Complaint alleges that Copeland, "in acting in compliance with Defendant, City of Fruitland policies, failed to abide by constitutional practice when conducting a search and seizure, which led to application of deadly and excessive force against Plaintiff." The Complaint fails to identify a specific policy. But, because Officer Copeland was not a policy maker, the proper Defendant is the City of Fruitland to the extent Wade asserts that a policy or custom caused the deprivation of his Fourth Amendment rights. Count I includes a constitutional allegation against <u>all</u> Defendants, but fails to identify, articulate, or even mention that a policy caused the constitutional deprivation of Wade's rights.

Additionally complicating matters, Defendants collectively moved for summary judgment on all claims in the Complaint (Motion, Dkt. 35), but in their moving brief, only articulate arguments regarding Officer Copeland's use of force and entitlement to qualified immunity, all the while acknowledging that the Complaint asserts excessive force claims against <u>both</u> Officer Copeland and the City of Fruitland (Defs.' Mem. at 2—17, Dkt. 35-1). Not until Defendants reply brief do they address the *Monell* issue, ostensibly to respond to Wade's *Monell* argument in his response brief.

**MEMORANDUM DECISION AND ORDER - 19**

Wade cites *Monell* in the context of a heading that "qualified immunity is inapplicable to the City of Fruitland and its Police Department." Pl.'s Response at 176 (Dkt. 36.) But, as noted above, the doctrine of qualified immunity does not apply to municipalities.  Next, Wade's argument about the City's policy is nonsensical. In essence, Wade argues that because Officer Copeland was exonerated during the ISP and Administrative Review investigation because he "followed policy," the use of deadly force, having been carried out in compliance with "policy," was unconstitutional. But Wade fails to articulate how the "policy" caused, or was the moving force behind, the constitutional deprivation.

In Wade's brief, he cites to one potential policy. The policy is described, then quoted, as follows:

> it is the stated policy of the Fruitland Police Department to forego the use of non-lethal force unless there is another officer backing them up:
>
>> During prior <u>training</u> at the Fruitland Police Department for "Less Lethal Shotgun," it had been strongly recommended that officer <u>should not deploy</u> "<u>less lethal</u>" weapons <u>unless they have another officer backing them up with lethal force</u>, This is done so that in the event "less lethal" weapons do not have the desired effect lethal force can be initiated to stop the threat if need. Dkt 35-7 at 10.
>
> Fruitland has a Use of Deadly Force Review Board that can only make two findings:
> 1. The employee's actions were within department policy and procedures; or
> 2. The employee's actions were in violation of department policy and procedures. (Exhibit E).

The "policy" cited indicates that the department, during training, recommends the use of lethal force in the absence of another officer on the scene. Wade asserts that Officer

**MEMORANDUM DECISION AND ORDER - 20**

Copeland followed police policy; identifies the above policy; and then concludes that the policy itself caused the violation of Wade's constitutional rights because Copeland must have followed it. But Wade fails to articulate how this policy was the "moving force" behind the shooting other than in a conclusory fashion. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers.).

Further, the referenced policy does not appear in the record to be an actual policy adopted by the City. Wade cites to Exhibit E as the source of the policy. (Dkt. 36-7.) But Exhibit E, referred as Policy 302, is the "deadly force review policy."[11] The citation to Docket 35-7 at 10 is to a paragraph of the Incident Report prepared by the Idaho State Police during its investigation into the shooting. No policy manual, or other evidence of City policy, is in the record before the Court. In other words, there is no proof that the quoted passage constitutes a policy adopted by the City of Fruitland or the Fruitland police department; rather, it appears to be a training recommendation. *See, e.g.*, *Mott v. City of McCall, Idaho*, 2007 WL 1430764 *6-7 (D. Idaho May 14, 2007) (noting that the defendants, in support of their motion, submitted the policies adopted by the McCall Police Department and that the plaintiff failed to show any alleged violation of policy was the result of a government policy or custom).

---

[11] During the hearing, Defendants noted that their expert, Meyer, reviewed Police Department Policy 300 regarding the use of force. However, Policy 300 is not part of the record other than its mere mention in Meyer's expert report.

Ultimately, however, it was Defendants' burden to show why Defendants City of Fruitland and the City of Fruitland Police Department should have the constitutional claims, however pled, asserted against them adjudicated upon summary judgment. Defendants did not move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. And, despite making an appearance on behalf of all named Defendants, Defendants' counsel never articulated a reason in their moving brief why named Defendants City of Fruitland and City of Fruitland Police Department should be dismissed from this lawsuit.[12]

In short, Defendants failed to carry their burden as to why Defendants City of Fruitland and City of Fruitland Police Department should be granted judgment as a matter of law. And Wade, as the non-moving party, is not entitled to a legal determination deciding his municipality liability theory allegedly contained in Counts I and II of the Complaint. It does not follow, however, from the Court's conclusion that the claims against all Defendants are properly pled— only that the issue of summary judgment in favor of Defendants City of Fruitland and Fruitland Police Department was not properly presented upon Defendants' motion.

---

[12] At the hearing, Defendants' counsel noted that the Answer to the Complaint asserted the City of Fruitland Police Department was not a proper party because it is not a recognized political subdivision subject to suit under § 1983. However, the first time Defendants mentioned this basis for dismissing the City of Fruitland Police Department as a named party was at the hearing.

**MEMORANDUM DECISION AND ORDER - 22**

3.      **State Law Claims**

The remaining two counts in the complaint are alleged under state law.[13] Count III

alleges that Officer Copeland's conduct was reckless, willful, and wanton because he

intentionally applied deadly force despite Wade's compliance with Officer Copeland's

instructions. Further, Wade relies upon Officer Copeland's adherence to police

department policy in support of his allegation that Officer Copeland acted intentionally

and knowingly to cause Wade bodily harm. Wade's final count alleges that Officer

Copeland committed gross negligence by utilizing deadly force after Wade had complied

with Officer Copeland's instructions. Based upon the Complaint, Counts III and IV are

asserted against Defendant Copeland only.[14] If Wade intended to the contrary, the

Complaint is not clear.

Defendants collectively argue that statutory immunity protects Defendants from

Wade's state law allegations because the Idaho Tort Claims Act, Idaho Code § 6-904,

exempts governmental entities and their employees acting within the course and scope of

their employment and "without malice or criminal intent" from a claim arising out of

assault or battery. Defendants argue that Officer Copeland's use of excessive force

constitutes a battery, and as such, Defendants are immune from liability because the

definition of battery does not require malice. Wade, on the other hand, contends that a

---

[13] Should the § 1983 claims be dismissed, federal court jurisdiction over the state law claims
would be eliminated. *Dilts v. Blair*, No. CV04–508–C–EJL, 2005 WL 2847415 *5 (Oct. 19, 2005).

[14] In Defendants' memorandum, they appear to be under the impression Counts III and IV apply
to all Defendants. But, upon examining the Complaint, the Court cannot discern any claim against the
municipality defendants other than the general reference to police policy.

**MEMORANDUM DECISION AND ORDER - 23**

jury could conclude that Officer Copeland acted without legal justification because his actions were unconstitutional, and therefore his use of deadly force constitutes malice.

The Court posits that there is a much simpler conclusion. The allegations in Wade's complaint rely upon whether Wade complied with Officer Copeland's instructions. There are disputed issues of material fact, discussed above, regarding whether Wade complied with Officer Copeland's instructions to show his hands or put them in the air, and whether his body language suggested aggression. Two experts disagree based upon a review of the same record before this Court. As such, the Court is unable to render a decision on Counts III and IV as a matter of law.

## CONCLUSION

Defendants' Motion for Summary Judgment will be denied. The parties are strongly encouraged to clarify the issues and the parties remaining for trial in accordance with the legal principals discussed above. The Court will conduct a telephonic scheduling conference with the parties to discuss available trial dates and to set pre-trial deadlines. A separate notice of hearing is forthcoming.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Defendants' Motion for Summary Judgment (Dkt. 35) is **DENIED**.

A separate notice of hearing for a telephonic scheduling conference to set trial and

pre-trial deadlines will be issued.

Dated: **March 04, 2014**

Honorable Candy W. Dale
United States Magistrate Judge